UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO. 3:21-CR-00153** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **CHARLIE L. SIMPSON (01)** | **MAGISTRATE JUDGE KAYLA** |
| **CHARLES D. GARDNER (02)** | **D. MCCLUSKY** |

**MEMORANDUM RULING**

Pending before the Court is a Motion in Limine to Exclude Endorsed Cashier's Checks and Request for Hearing ("Motion in Limine") [Doc. No. 248] filed by the United States of America (the "Government"). An Opposition [Doc. No. 259] was filed by Charles D. Gardner ("Gardner") and by Charlie L. Simpson ("Simpson") [Doc. No. 260], (collectively "Defendants").

For the reasons set forth herein, the Government's Motion in Limine is **GRANTED**.

**I. BACKGROUND**

Simpson and Gardner were indicted for four counts of Bank Fraud and one count of Conspiracy to Commit Bank Fraud.[1] The case is set for trial on April 8, 2024. In the Motion in Limine, the Government seeks to exclude evidence that four cashier's checks, issued by Origin Bank and deposited with First National Bank by Defendants, were not endorsed, were returned for endorsement, and were re-submitted after being endorsed.

The Government argues these facts are irrelevant because the crimes had already been committed. Defendants argue that these facts are relevant to Simpson and Gardner's defense that they did not intend to defraud the banks, and that the loss did not occur on March 10, 2017 (as

---

[1] [Doc. No. 1]

stated in the Indictment). As part of their defense, Defendants argue that the cashier's checks could not have become negotiable instruments until they were properly endorsed.

The Government also asks to have an evidentiary hearing prior to trial to provide Defendants with an opportunity to ask questions about the intent in order to determine whether the facts are relevant. The request for an evidentiary hearing is opposed by Simpson and Gardner.

This Court previously ruled [Doc. No. 74] that evidence that Origin Bank converted the loss into a loan after the alleged scheme collapsed was not relevant to the crimes of bank fraud and conspiracy to commit bank fraud. The Government argues the lack of evidence of endorsement should be excluded for the same reasons.

## II.   LAW AND ANALYSIS

### A.   The Indictment

The Indictment [Doc. No. 1] alleges that on a date unknown, but not later than April 2016, and continuing until March 10, 2017, Simpson and Gardner did conspire to violate Title 18 United States Code § 1344(1) by knowingly executing and attempting to execute a scheme to defraud Origin Bank, People's Bank, and Louisiana National Bank, FDIC insured financial institutions.

The Indictment further alleges Simpson and Gardner fraudulently obtained money and credits from Origin Bank, Peoples Bank, and Louisiana National Bank by orchestrating and executing a check kiting scheme between the banks to artificially inflate the balances by "float". The Indictment further alleged the "float" was used by Simpson and Gardner to raise their salaries and to pay personal expenses.

The Indictment further alleges that Simpson and Garner committed four counts of bank fraud pursuant to 18 U.S.C. § 1344(1) with regard to Origin Bank by obtaining four certified checks[2] on March 9, 2017.

### B. Elements of the Offenses

Bank fraud under 18 U.S.C. § 1344(1) requires that the Defendants knowingly execute, or attempt to execute, a scheme or artifice to defraud a financial institution. A "check-kiting" scheme is designed to separate a bank from its money by tricking it into inflating bank balances and honoring checks drawn against accounts with insufficient funds. Bank fraud does not require a specific intent to permanently deprive the bank of its funds. It is sufficient to knowingly participate in a scheme to trick the bank into inflating bank balances by kiting checks between two or more banks. The bare act of check kiting defrauds the bank by temporarily placing the bank's funds at the disposal of the account holder. *U.S. v. Frydenlund*, 990 F. 2d 822, 824 (5th Cir. 1993).

To find a conspiracy violation, the jury need only find agreement between two or more persons to violate the law and an overt act by one member of the conspiracy in furtherance of the conspiracy. A specific agreement need not be shown, but may be inferred from concert of action. Id at 824.

In *U.S. v. Stone*, 954 F.2d 1187, 1193 Fn. 1 (6th Cir. 1992), "check kiting" was defined as:

> Check kiting consists of drawing checks on an account in one bank and depositing them into an account in a second bank when neither account has sufficient funds to cover the amounts drawn. Just before the checks are returned for payment to the first bank, the kiter covers them by depositing checks drawn on the account in the second bank. Due to the delay created by the collection of funds by one bank from the other, known as the "float" time, an artificial balance is created.

---

[2] $200,000.00; $300,000.00; $800,000.00 and $800,000.00

3

There are five elements the Government must prove in order to convict a defendant under 18 U.S.C. § 1344(1):

*First*: That the defendant knowingly executed a scheme or artifice;

*Second*: That the scheme or artifice was to defraud a financial institution; as alleged in the indictment;

*Third*: That the defendant had the intent to defraud the financial institution;

*Fourth*: That the scheme or artifice to defraud was material; and

*Fifth*: That the defendant placed the financial institution at risk of civil liability or financial loss.

*Pattern Crim. Jury Instr.* 5th Cir. 2.58A (2019).

A "scheme or artifice" means any plan, pattern, or course of action intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived. Id.

To act with "intent to defraud" means to do something with the specific intent to deceive or cheat someone, ordinarily for personal financial gain or to cause financial loss to someone else. However, a 'scheme to defraud' demands neither a showing of financial loss nor a showing of intent to cause financial loss." Id.

To prove that "the defendant placed the financial institution at risk of civil liability or financial loss," it is not necessary for the government to demonstrate that the financial institution actually suffered civil liability or financial loss, or that it found a substantial likelihood of risk of loss. Id.

Additionally, the Indictment alleges that "on or about March 9, 2017," the Defendants committed four counts of bank fraud. When the term "on or about" is used in the Indictment, the Government does not have to prove that the crime was committed on the exact date, so long as the

government proves beyond a reasonable doubt that the defendant committed the crime on a date reasonably near the date stated in the indictment.[3]

    **C.**     **Analysis**

The Government does not have to prove Origin Bank sustained a loss. Additionally, the specific date alleged in the Indictment does not have to be proven, as long as the crime was committed at a date reasonably near March 9, 2017. Therefore, the fact that the four cashier's checks were not endorsed is not relevant to these elements.

The only way the lack of endorsements could be relevant to any element is whether there is relevance to the element of intent to defraud (third element) or whether depositing the cashier's checks without endorsement put Origin Bank at the risk of civil liability or financial loss (fifth element). Both depend on whether Origin Bank was required to honor the cashier's checks without endorsement.

The Government alleges the following facts about Simpson and Gardner. On or about March 8, 2017, Simpson and Gardner issued checks totaling $4,000,000.00 from accounts at Peoples Bank and deposited the funds at Origin Bank, artificially inflating the available balances.[4] On the following morning, March 9, 2017, Simpson, and Gardner used the inflated balances to obtain four cashier's checks totaling $2,100,000.00 from Origin Bank.[5]

Simpson personally picked up the four cashier's checks from Origin Bank and deposited the cashier's checks into overdrawn accounts of United Home Care and/or Trinity Home Health at First National Bank.[6] On March 10, 2017, Origin Bank was informed that insufficient funds

---

[3] Pattern Crim. Jury Instr. 5th Cir. 1.19 (2019); *United States v. Mata*, 491 F.3d 237, 243 (5th Cir. 2007).
[4] [Doc. No. 248, p. 4]
[5] [Id., p. 5]
[6] [Id., p. 5]

existed to cover the $4,000,000.00 of checks Simpson and Gardner had deposited with Origin drawn on People's Bank accounts. When the cashier's checks were presented to Origin Bank for payment by First National Bank, Origin Bank returned the cashier's checks to First National Bank due to "missing endorsement." The cashier's checks were then endorsed (purportedly by John D. Jones) and then re-run, being then honored by Origin Bank, which resulted in a substantial financial loss to Origin Bank.[7] The Government maintains what happened after Defendants' scheme ended is irrelevant.

The Government argues that when Origin Bank issued the cashier's checks, the checks were guaranteed funds, paid at the time of issuance, and not presented back to the issuing bank for payment like a regular check would have been. Although Origin may have had the right to return the cashier's checks for missing endorsements, they had no right to refuse the checks once they were endorsed. In other words, once Origin Bank issued the cashier's checks, they had an obligation to pay the checks, even knowing the payment was going to result in a substantial loss to Origin Bank. The lack of endorsement only delayed the inevitable.

Simpson and Gardner argue that Origin was not obligated to pay the cashier's checks, citing La. R.S. 10:3-201, 10:3-411, and 10:3-418.

Therefore, the issue is whether, after issuing four cashier's checks totaling $2,100,000.00, Origin Bank had the right to stop payment on the checks. Although the cashier's checks were not initially endorsed, they were sent back by Origin Bank for lack of endorsement. The four cashier's checks were paid by Origin Bank once the checks were endorsed.

---

[7] [Id., pp. 5-6]

There is no question that prior to the January 1, 1994, amendments to Title 10 Commercial Laws (Acts 1992, No. 1133), Origin Bank would not have been able to stop payment on the cashier's checks. In *First Financial L.S.L.A. v. First American Bank and Trust Co.*,489 So.2d 388, 392 (La. App. 5th Cir. 1986), the court held that a cashier's check was a cash equivalent and therefore the bank was prohibited from issuing a stop payment order on its own cashier's check for failure of consideration.

Louisiana law did not address the issue of whether a bank can stop payment on its cashier's check or whether it can assert the defense of failure of consideration, so the court looked to the law of other jurisdictions. Louisiana courts found that the majority of jurisdictions defined a cashier's check as a substitute for cash and disallow defenses (including failure of consideration) to the issuing bank. *First Financial L.S.L.A.*, 489 So.2d 388, 390 (La. App. 5th Cir. 1986).

The Louisiana appellant court cited La. R.S. 10:4 303(1)(a), which disallowed stop payment orders on items which the bank has "accepted or certified." Because La. R.S. 10:4-303(1)(a) disallowed stop payment orders on accepted items, a bank cannot issue a stop payment order on its own cashier's check.

That pertinent language in La. R.S. 10:4-303(1)(a) was not changed in the 1994 amendment. The statute still prohibits a payor bank from stopping payment on its own cashier's checks because the payor bank has accepted or certified the funds. La. R.S. 10:3-411(b) even makes the payor bank liable for damages and expenses if it refuses to pay a cashier's or certified check.[8]

---

[8] 10:3-411(c) states expenses or damages are not recoverable if the payor bank asserts a defense, it has reasonable grounds to believe is available, but still does not allow the obligated bank to refuse to pay a cashier's check.

This Court finds that as the payor bank that issued four cashier's checks totaling $2,100,000.00, Origin Bank had no right to stop payment on the checks because cashier's checks are a cash equivalent, and Origin Bank had "accepted or certified" the funds. Although Origin Bank had the right to send the cashier's checks back for lack of endorsement, once the endorsement was completed, Origin Bank had to pay them. The damage was done by issuing cashier's checks, and Origin Bank sustained a loss because of it. Therefore, the lack of endorsement on the cashier's checks is irrelevant, and the Government's Motion in Limine is **GRANTED.**

### III. CONCLUSION

For the reasons set forth herein,

**IT IS ORDERED** that the Government's Motion in Limine [Doc. No. 248] is **GRANTED.**

**MONROE, LOUISIANA**, this 7th day of December 2023.

_____
**TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE**