# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CASE NO. 3:21-CR-00153** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **CHARLIE L. SIMPSON (01)**<br>**CHARLES D. GARDNER (02)** | **MAGISTRATE JUDGE KAYLA D. MCCLUSKY** |

## <u>MEMORANDUM ORDER</u>

On April 22, 2024, a jury found Defendant Charlie L. Simpson ("Simpson") guilty of Conspiracy to Commit Bank Fraud (Count 1), in violation of 18 U.S.C. § 1349 and of four counts (Counts 2-5) of Bank Fraud, in violation of 18. U.S.C. § 1344.

The jury also found Defendant Charles D. Gardner ("Gardner") guilty of Conspiracy to Commit Bank Fraud (Count 1), in violation of 18 U.S.C. § 1349, but was unable to reach a verdict as to the four counts of Bank Fraud (Counts 2-5).

Thereafter, both Simpson and Gardner filed Motions for a New Trial [Doc. Nos. 399, 402] and a Motion for a Judgment of Acquittal [Doc. Nos. 400, 402]. The Government filed an in Globo Opposition [Doc. No. 407] and Simpson and Gardner both filed Replies [Doc. Nos. 411, 409].

For the reasons set forth herein, Simpson and Gardner's Motions for Judgment of Acquittal and Motions for New Trial are **DENIED**.

## I.    BACKGROUND

United Home Care ("United") and Trinity Home Health Care ("Trinity") (collectively, "companies") provide home healthcare services in north Louisiana. John "Danny" Jones ("Jones") was the sole owner of both companies. Jones also owned DMJ Rentals, a limousine rental service, and DMJ United Properties, a real estate business.

On May 2, 2011, Simpson was hired as the Chief Financial Officer ("CFO") of United and Trinity. On April 23, 2012, Simpson hired Gardner to replace himself as CFO, and Simpson was promoted to Chief Operating Officer ("COO"). Simpson managed the daily operations while Gardner managed the accounting department for the companies.

Beginning no later than April 2016, United, Trinity, and the DMJ companies began spending more than they were collecting, resulting in an increasing and unusual pattern of spending. Specifically, Simpson and Gardner were moving deposits back and forth between Origin Bank, First National Bank, and later People's Bank, to use the "float" that resulted from these transfers. These transfers increased over 2016 and early 2017 to the point that deposits were being moved once or twice per day to cover overdrafts.

The Government presented the expert testimony of Carl Richard ("Richard"), an expert in accounting and fraud examination. Richard examined the accounts that were used by Simpson and Gardner to allegedly commit the crimes, including four accounts at Origin Bank, four accounts at First National Bank, and four accounts at People's Bank.

Richard testified that between January 1, 2016, and March 7, 2017, the transfers back and forth between the United and Trinity accounts of Origin Bank and First National Bank totaled $409,605,919.00. In comparison during the same timeframe, deposits from third parties into these accounts totaled approximately $39,000,000.00. The alleged purpose of the conspiracy and bank fraud between Simpson and Gardner were to fund the increased salaries and quarterly bonuses that Simpson and Gardner received from United and Trinity.

Ultimately, the scheme collapsed in early March 2017, when First National Bank officer, Michael McGee ("McGee"), notified Simpson that certified funds were required to cover an overdraft in company accounts at First National Bank.

2

Because of First National Bank's certified funds requirement on March 8, 2017, Gardner instructed an accountant, Kassidy Broussard ("Broussard"), to write twenty-five (25) checks for approximately $4,000,000.00 from United and Trinity accounts at People's Bank to accounts at Origin Bank (despite the People's Bank accounts only having a total of approximately $2,000.00).

On March 8, 2017, the approximate $4,000,000.00 in checks from People's Bank were deposited into United and Trinity accounts at Origin Bank, artificially inflating the available balance. The next day, Simpson went to the smaller branch of Origin Bank, located in Calhoun, Louisiana, and obtained four cashier's checks totaling $2,100,00. Those checks were then taken by Simpson and deposited in United and Trinity's accounts at First National Bank, along with $600,000.00 from a line of credit from Alleon Capital ("Alleon").

However, on March 10, 2017, when Origin Bank received notice from People's Bank that People's Bank was returning the approximate $4,000,000.00 in checks (because only $2,000.00 in deposits were in the People's Bank accounts), Origin Bank was left with a loss of approximately $3,359,431.30.

On June 30, 2021, both Simpson and Gardner were indicted on one count of conspiracy to commit bank fraud and Simpson also indicted as to four counts of bank fraud.

## II.    Motions for Judgment of Acquittal

A motion for judgment of acquittal is a challenge to the sufficiency of the evidence. Fed. R. Cr. P. 29. The relevant question in assessing a Rule 29 motion is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The Defendants make three arguments in support of their motions for acquittal:

A)  The Government used an improper and legally insufficient theory of fraud;
B)  The Government constructively amended the indictment; and
C)  The Government did not present sufficient evidence to sustain the conviction.

The Court will address each will be addressed in turn.

### A.    Legally Insufficient Theory

The Government theorized that Simpson and Gardner profited personally by the check-kiting scheme, through increases in salary and quarterly bonuses. However, Simpson and Gardner argue that this theory was legally improper. The federal wire and mail fraud statutes criminalize only schemes to deprive people of traditional property interests. *Ciminelli v. United States*, 598 U.S. 306, 309 (2023). The Government must prove not only that the wire fraud defendants "engaged in deception," but also that money or property was an "object of their fraud." *Kelly v. United States*, 140 U.S. 1565, 1571 (2020).

The Indictment alleges that beginning on a date unknown, but not later than April 2016, and continuing until March 10, 2017, Simpson and Gardner did knowingly and intentionally conspire to execute a scheme to defraud Origin Bank, People's Bank, and Louisiana National Bank. The alleged object of the conspiracy was to fraudulently obtain money and credits from those banks. The Indictment further alleged a check-kiting scheme used to artificially inflate balances at the banks, which were used to cover business costs, personal spending, and an increase of salaries as to Simpson and Gardner.[1]

---

[1] [Doc. No. 2, p. 4 D2].

Simpson and Gardner argue that increased salaries and bonuses cannot be the money or property that was the "object of their fraud" because they were not "traditional property interests."[2]

In *United States v. Yates*, 16 F.4th 256 (9th Cir. 2021), the defendants were convicted of conspiracy to commit bank fraud and making false bank entries. The government used "accurate information" and "salary maintenance" theories in proving the conspiracy. *Id*. at 265. The "accurate information" theory used by the government, which asserted that the purpose of the conspiracy was to conceal the true financial picture of the bank and to create a better financial picture of the bank, was found insufficient. *Id.* The court found that "the right to make an informed business decision" and the "intangible right to make an informed lending decision" cannot constitute "something of value." *Id*. (cleaned up).

In *Yates*, the government also used the "salary-maintenance" theory, in which they argued that the defendants sought to continue the benefits of employment, including salaries and benefits. *Id*. at 264. Although the "salary maintenance" theory was also held to be insufficient, the court differentiated between a scheme that sought to continue a salary and a scheme whose object is to obtain a new or higher salary:

> But there is a difference between a scheme whose object is to obtain a new or higher salary and a scheme whose object is to deceive an employer while continuing to draw an existing salary – essentially, avoiding being fired. The history of the Supreme Court's treatment of fraud in the employment context demonstrates why that distinction matters. 16 F.4th 256 at 266.

In analyzing the Supreme Court's treatment of fraud in the employment context, the Court found a scheme to deprive the bank of an "increased" salary or bonus would be a valid theory, while a scheme to deprive the bank of existing salaries would not. *Id.*

---

[2] [Doc. No. 400-1, p. 5].

5

This Court agrees with the *Yates* analysis. The Government presented evidence at trial that both Simpson and Gardner received quarterly bonuses and substantial increases in their salaries, despite United and Trinity having substantial cash flow problems.[3]

Therefore, the Government has set forth a legally sufficient theory for the object of the conspiracy to commit bank fraud.

### B.      Constructive Amendment

Simpson and Gardner further argue that the case presented at trial "constructively amended" the Indictment because the Indictment did not allege Simpson and Gardner's object of the conspiracy was to obtain a "new or higher salary."[4]

After an indictment has been returned, its charges may only be broadened through amendment by the grand jury itself. *United States v. Hoover*, 467 F.3d 496, 500 (5th Cir. 2006). "A constructive amendment violates the defendant's right under the Fifth Amendment to a grand jury indictment." *United States v. Rubio*, 321 F.3d 517, 521 (5th Cir. 2003). A "constructive amendment" occurs when it permits the defendant to be convicted upon a factual basis that effectually modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that of which defendant was charged. *United States v. McMillan*, 600 F.3d 434, 450-51 (5th Cir. 2010).

No constructive amendment argument was made by Simpson or Gardner until after the trial. No objection was made before or during the trial. The first pleading making this argument was the pending Motion for New Trial. A constructive amendment argument not preserved on the record is reviewed for plain error. *United States v. Chaker*, 820 F.3d 213, 214 (5th Cir. 2016). In

---

[3] [Doc. No. 371 (Testimony of Special Agent Timothy Stephens)].
[4] [Doc. No. 400-1, p. 5]

*United States v. Baker*, 544 F.Supp.2d 522, 527 (E.D. La. Apr. 8, 2008), the court explained the difference between a constructive amendment and a material variance. "A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Id.* (quoting *United States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984). A variance "is permissible unless prejudice is shown by the defendant," whereas a constructive amendment is "fatal without regard to prejudice." *United States v. Mueffelman*, 470 F.3d 33, 37-38 (1st Cir. 2006). In *Baker*, the defendant sought a new trial because "several material variances or constructive amendments occurred" including that Tardy made his statement to only one agent, instead of two agents. *Baker*, 544 F.Supp at 535. The court ruled that the difference in making a false statement to one FBI agent (as adduced at trial) instead of more than one (as alleged in the indictment) did not "effectively modify an essential element of the offense charged." *Id.* at 538. (quoting *United States v. Young*, 730 F.2d 221, 223 (5th Cir. 1984)).

Here, the pertinent part of the Indictment alleged a check kiting scheme used to artificially inflate balances at the banks, which were used to cover business costs and personal spending of company executives, including Simpson, and payroll expenses, "including the salaries of Simpson and Gardner."[5] Simpson and Gardner argue that the Indictment should have had the word "increased" in front of "salaries." As stated above, a constructive amendment requires modification to an essential element of the charge, or materially different theory or set of facts. *McMillan*, 600 F.3d at 450-51. Like the court ruled in *Baker* regarding the false statements to one or more than one FBI agents, this Court does not find the failure to use the word "increased" on

---

[5] [Doc. No. 2, pp. 4, D2].

the Indictment is either a constructive amendment or a variance. But even if the word "increased" could be a variance, the Court finds no prejudice to the Defendants. As the record reflects, this issue was briefed and ruled on six months prior to the trial.[6]

The question of whether increased salaries and bonuses were an object of the scheme to defraud was addressed in a motion in limine[7] six months prior to trial. On September 25, 2023, before the trial began, this Court ruled[8] that the Government must show the object of the fraud was for Simpson and Gardner to receive higher salaries, not to keep an existing salary. The Government was therefore prohibited from presenting a "salary-maintenance" theory. Thus, the evidence presented at trial was narrower, not more expansive than the wording of the Indictment. In addition, at least six months prior to trial, the Defendants were aware that the Government was arguing the object of the fraud was for Simpson and Gardner to receive higher salaries and bonuses.

Therefore, there was no constructive amendment of the Indictment.

### C.    Sufficient Evidence to Sustain the Conviction

In reviewing the sufficiency of the evidence on a motion for judgment of acquittal, the Court must "view the evidence in the light most favorable to the jury verdict and will affirm 'if a rational trier of fact could have found that the Government proved all essential elements of the crime beyond a reasonable doubt.'" *United States v. Schuchmann*, 84 F.3d 752, 753-54 (5th Cir. 1996); *United States v. Ganji*, 880 F.3d 760, 767 (5th Cir. 2018).

After being present during the entire trial and after, thus reviewing all testimony and evidence, this Court finds that the evidence was sufficient to convict Simpson of four counts of

---

[6] [Doc. Nos. 197, 203].
[7] [Id.].
[8] [Doc. No. 241].

8

bank fraud and one count of conspiracy to commit bank fraud. The evidence was also sufficient to convict Gardner of conspiracy to commit bank fraud. *United States v. Saks*, 964 F.2d 1514 (5th Cir. 1992).

Moreover, to prove conspiracy, the Government must prove beyond a reasonable doubt that there was an agreement between two or more persons to commit bank fraud; that each defendant knew the purpose of the agreement; and each defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose.

Bank fraud requires proof the defendant knowingly executed a scheme or artifice to defraud; the scheme or artifice to defraud was a financial institution; the defendant had the intent to defraud the financial institution; the scheme or artifice to defraud was material; and the defendant placed the financial institution at the risk of financial loss. *United States v. Campbell*, 64 F.3d 967 (5th Cir. 1995).

A scheme to defraud must be one to deceive the bank and deprive it of something of value, that is, money or property. *Neder v. United States*, 527 U.S. 1, 20-21 (1999). The success of a scheme to defraud is not a requirement, but specific intent to defraud is an essential element of the crime. *United States. v. Foshee*, 569 F.2d 401, 403 (5th Cir. 1978).

On April 23, 2012, Simpson hired Gardner to replace himself as CFO, and Simpson was promoted to COO. The Government alleged that not later than April 2016, United, Trinity, and the DMJ Companies began spending more than they were collecting, resulting in an increasing pattern where Simpson and Gardner were moving deposits back and forth between Origin Bank, First National Bank, and People's Bank, in order to use the float that resulted from the transfers.

The fact that Origin Bank, First National Bank, and People's Bank were all financial institutions was uncontested. Chad Wilson ("Wilson") testified that all three banks were insured by the F.D.I.C. on March 10, 2017.[9]

The testimony of Special Agent Timothy Stephens ("Agent Stephens") showed that when Gardner applied for CFO, his desired salary range was $52,000.00, but that Gardner's previous salary was $42,000.00. Yet, the testimony and evidence showed consistent salary increases. Gardner's last raise before the scheme collapsed went from $85,000.00 to $100,000.00 on January 18, 2016. The testimony of Agent Stephens also showed increases in salary and bonuses as to Simpson. Simpson's salary increased from $148,760.00 on January 1, 2014, to $183,760.00 on January 18, 2016.[10]

Broussard, who worked as an accountant in the payroll department for United and Trinity, testified to the amount of salary increases and bonuses of Simpson and Gardner in 2016. She testified that as of December 31, 2016, Simpson received total salary of $197,318.77. In addition, Simpson claimed bonuses from United in the amount of $29,861.00 and bonuses from Trinity in the amount of $114,053.00, for a total of $341,232.77.[11]

Broussard further testified that as of December 31, 2016, Gardner had received a salary of $108,172.98, vehicle allowance of $4,050.00, United bonuses of $12,500.00, and bonuses from Trinity totaling $54,500.00, for total compensation in 2016 of $175,172.98.[12] On January 22, 2016, Gardner thanked Simpson for his raise and for the confidence Simpson had in him.[13]

---

[9] [Doc. No. 370, pp. 44-45, (Testimony of Chad Wilson)].
[10] [Doc. No. 371, p. 45].
[11] [Doc. No. 372, p. 130, (Testimony of Kassidy Broussard)].
[12] [Id. at p. 131].
[13] [Doc. No. 350-27].

The Government then presented evidence of significant activity of Simpson and Gardner moving their deposits back and forth from bank to bank. Michael McGee ("McGee") was Chief Lending Officer of First National Bank. United, Trinity, and the DMJ entities had a total of six[14] accounts at First National Bank. McGee documented millions of dollars being deposited, then withdrawn between January 31, 2017, and March 31, 2017. Despite the millions of dollars that went through these accounts, the statements showed very low average balances.[15]

McGee was the first officer looking over these accounts and would talk with Simpson, and later Gardner, when the accounts were overdrawn. Simpson would give various reasons for the overdrafts in the First National Bank accounts. Numerous e-mails presented at trial showed the various reasons given by Simpson to McGee for the frequent overdrafts in the First National Bank accounts.[16]

In addition to testifying about the amount of Simpson and Gardner's salary and bonuses, Broussard performed bank reconciliation. She testified that the financial statements for United;[17] Trinity;[18] DMJ Properties;[19] and DMJ Rentals[20] showed substantial negative balances for almost every month from January 31, 2016, through February 28, 2017. The United account negative balances ranged from negative $333,724.83 on January 1, 2016, to negative $1,375,100.50 on February 28, 2017 (right before the collapse).

---

[14] Account #s 143790; 143812; 143782; 143820; 141291; and 147842.
[15] [Doc. No. 350, Exhibits G-168-4; G-168-5; G-168-6; G-171; G-172; G-175; and G-174].
[16] [Id., Exhibits G3-4; G3-13; G3-18; G3-27; G3-28; G3-30; G3-38; G3-41; G3-63; G3-67; G176-1; G177; G3-96; G3-110; G3-119; G3-130; G3-151; G3-154; G3-175; and G3-183].
[17] [Id., Exhibit G-186].
[18] [Id., Exhibit G-187].
[19] [Id., Exhibit G-188].
[20] [Id., Exhibit G-185].

The Trinity balances ranged from negative $449,443.56 on January 31, 2016, to negative $1,666,385.60 on February 28, 2017. The DMJ Properties account began with a negative balance of negative $112,970.88 on January 31, 2016, and ended with a negative balance of $408,928.85 on February 28, 2017. And the DMJ Rentals account (which was a limousine service), began with a balance of negative $101,556.15 on January 31, 2016, and ended with a negative balance of $383,844.90.

Broussard also testified that she was involved in group emails between Simpson and Gardner. These emails corroborated Broussard's testimony that Broussard was given instructions by Simpson and Gardner to assist in transferring money in the United and Trinity accounts from one bank account to the other. She testified she got the information from Simpson or Gardner and then wrote the checks.[21] Broussard further testified that in the beginning, the back-and-forth deposits were not as often, but eventually became daily or even twice per day. Simpson or Gardner communicated to her about the deposits by text, or by writing the amounts on a piece of paper.

Broussard also testified that Simpson would determine the amounts for the transfers and Gardner would supervise that the transfers were completed.[22] The Government presented numerous exhibits documenting instructions from Simpson and Gardner for the deposits to be made in the various accounts.[23]

Theresa Steinbruck ("Steinbruck") worked at United/Trinity. She also assisted in making the money transfers. She testified she would normally make these deposits twice daily, once in the

---

[21] [Doc. No. 372 p. 161].
[22] [Id. at 162].
[23] [Doc. No. 350-57, Exhibits G5-4; G5-5; G5-8; G5-12; G5-13; G5-17; G5-30; G5-31; G5-32; G5-33; G5-40; G5-43; G5-45; G5-50; G5-54; and G5-67].

morning and once in the afternoon.[24] Steinbruck further testified she would usually get a text or an email from Gardner. She identified evidence documenting these messages from Gardner.[25]

The United and Trinity accounts at Origin Bank are the accounts that actually took a loss in March 2017. Jeff Letson ("Letson") was initially in charge of these accounts but transferred the United/Trinity Origin Bank accounts to Harold Book, Jr. ("Book").[26]

Book took over the United/Trinity accounts at Origin Bank when Letson was promoted. As the Origin Bank loan officer over the United/Trinity accounts, Book would be notified of United/Trinity overdrafts and would contact Simpson in regard to these overdrafts. At trial, Book went through numerous messages between he and Simpson, documenting overdrafts.[27] This testimony and evidence showed the several excuses given by Simpson for the overdrafts, many of which turned out being untrue.

Ginger Ezell ("Ezell") worked with United/Trinity from 2008-2018. Her direct supervisor was Simpson. She kept a billing log spreadsheet in which she made sure the billing to Medicare and Medicaid made it to the bank. Despite Simpson's many excuses to bank officers regarding Medicare and Medicaid delays, Ezell testified that she did not remember any significant Medicare delays, and that it usually only took a couple of days to obtain Medicare deposits.[28]

Stan Elkins ("Elkins") was President of People's Bank from 2013 to 2018. Simpson approached Elkins about a line of credit at People's Bank. Also, United/Trinity opened several

---

[24][Doc. No. 373, p. 160].
[25][Doc. No. 350, Exhibits G5-53; G5-49; G5-62].
[26] [Doc. No. 373, p. 199].
[27] [Doc. No. 350, Exhibits G-163; G-162; G-164; G-161; G-160; G-156; G-155; G-154; G-153; G-152; G-151; G-149; G-148; G-147; G-146; G-142; G-138; G-130; G-128; G-127; G-125; G-121; G-119; G-117; G-115; G-113; G-110; G-107; G-106; G-104; G-98; G-96; and G-95].
[28] [Doc. No. 374, p. 235].

accounts at People's Bank on October 26, 2016, and put $500.00 in each account. The accounts were not utilized until March 18, 2017.[29]

Agent Stephens also testified about the substantial emails and communications between Simpson and Gardner.[30]  These emails alone are sufficient for a reasonable jury to have found that both Simpson and Gardner had the necessary intent to commit conspiracy to commit bank fraud and for Simpson to additionally be found guilty of four counts of bank fraud.[31]

The Government additionally presented evidence that in January 2016, Simpson applied to Alleon Capital Partner for a line of credit for United and Trinity. Alleon employees documented the application process and eventual funding of the Alleon line of credit. Both Simpson and Gardner were involved in this process.[32]

As shown by the Union/Trinity financial statements, and as testified to by Broussard, the Union/Trinity cash flow problems became increasingly severe throughout 2016 and into 2017. The Government testimony and evidence detailed how the scheme collapsed in early March 2017. The collapse began when First National Bank officer, McGee, notified Simpson that certified funds

---

[29] [Doc. No. 350, Exhibits G-179; G-178; G-181 and G-182].

[30] [Doc. No. 376, pp. 183 – 233, Exhibits G3-6; 3-7; 3-9; 3-10; 3-17; 3-25; 3-26; 3-33; 3-45; 3-46; 3-47; 3-48; 3-49; 3-51; 3-52; 3-54; 3-55; 3-58; 3-59; 3-60; 3-62; 3-64; 3-65; 3-66; 3-80; 3-94; 3-117; 3-122; 3-123; 3-124; 3-125; 3-126; 3-127; 3-132; 3-133; 3-134; 3-135; 3-136; 3-137 and 3-138].

[31] For instance, "I don't want to make it obvious to the banks. Maybe let two different people take the deposits. I need the float; (3-6) we're in a tough cash flow crunch due to pitiful billing; let's do these after 4:00. I need the float (3-9); did you put some "catch-up" in that tax payment or is it regular? (3-52); let's do it ASAP (3-54). We cannot cover hay (3-64); we are in a bind in a bad way right now (3-65); when the powers that be see that overdraft is not going, it's not going to be good (3-80); I think Theresa should forget to take business administrator their checks and take Monday morning. Extra day will mean a lot (3-122); Danny wants us to meet and go over budget. I would like for us to meet and make adjustments first (3-124); Oh yeah and pray. Banks are getting nervous (3-124); Mike was freaking out today and made me cover returned checks with certified funds (3-134). Must be a different day at FNB. They're watching and verifying everything. Something is up. (3-135); We have to be crazy creative to cover checks today. (3-155); Doubtful we will get them to deposit it but take it to the Origin Bank Calhoun only. Go through the drive thru. (4-30); Same old FNB. Put a hold on deposits and returned checks to Origin Bank. I am nervous how Origin Bank is going to react to that. Could be huge. (4-125)."

[32] [Doc. No. 370, Transcript of testimony of Leon Chernyavski, Alex Boguslavsky and Ben Rutkevitz].

were required to cover overdrafts at First National Bank.[33] Because of the certified funds requirement, Broussard testified Gardner instructed her to write twenty-five (25) checks for approximately $4,000,000.00 from Trinity and United accounts in People's Bank to United and Trinity accounts at Origin Bank.[34] The People's Bank accounts had not been used since their creation several months before, and had less than $2,000.00 in total in the accounts.

On March 8, 2017, the twenty-five (25) checks from People's Bank were deposited into United and Trinity's accounts at Origin Bank, artificially inflating the available balance. The next day, Simpson drove to the smaller Calhoun Origin Bank location and obtained four cashier's checks from Origin Bank totaling $2,100,000. Amanda Massey ("Massey"), the Origin Bank Calhoun Branch Manager, testified that she got a call from Simpson to issue the four cashier's checks. Simpson arrived at the Calhoun Branch, picked up the checks, said he was in a hurry, and left.[35]

The four cashier's checks were then taken by Simpson and deposited in the overdrawn United and Trinity accounts at First National Bank. In a further attempt to cover the First National Bank overdrafts, Simpson had an additional draw of $600,000.00 on the Alleon line of credit to deposit into the First National Bank accounts.[36]

Thereafter, Origin Bank received notice from People's Bank that People's Bank was returning the approximate $4,000,000.00 in checks (since United and Trinity had only a total of

---

[33] [Doc. No. 371, p. 141; Exhibit G 3-4].
[34] [Doc. Nos. 350, Exhibit 5-67; 373, p. 190-91].
[35] [Doc. No. 376, p. 12].
[36] [Doc. No. 370, pp. 220-222].

$2,000.00 in those accounts), and Origin Bank was left with a loss of approximately 3 million dollars.[37]

Richard examined all the Union and Trinity accounts at Origin Bank (4), First National Bank (4), and People's Bank (4). The timeframe examined for these accounts was from January 1, 2016, to March 7, 2017.  Richard testified there was a total of approximately $39,000,000.00 of third-party deposits into those twelve accounts during that time period. However, in comparison, during that time, (1/1/16 – 3/7/17), Richard testified that the transfers back and forth between the United and Trinity accounts at Origin Bank and First National Bank totaled $409,605,919.00. In other words, the back-and-forth transactions between United and Trinity from one bank to the other amounted to ten times more than the total receipts from third parties such as Medicare and Medicaid.

Richard also testified that the total "float" between the Origin Bank and First National Bank accounts was $3,815,186.00 on March 7, 2017.[38] Richard testified that in a circular check-kiting scheme, you must move money back and forth and use the float in order to keep from being overdrawn. If outside funds do not come in, you must keep it going.[39]  Richard also testified that his examination of the accounts showed that as of April 2016, the check-kiting activity had become circular and that deposits between the accounts was going to have to take place just about every day.[40]

---

[37] [Doc. No. 350-110, pp. 64-69].
[38] [Doc. No. 377, p. 150].
[39] [Doc. No. 377, pp. 108-109].
[40] [Doc. No. 377, p. 138].

Richard also verified that the People's Bank twenty-five (25) checks of approximately $4,000,000.00 were inflating the Origin Bank balance and without the People's Bank checks, the Origin Bank accounts would have shown a negative balance.

The evidence was sufficient for a rational trier of fact to have found that the Government proved all elements of conspiracy to commit bank fraud by both Simpson and Gardner, and of four counts of bank fraud by Simpson. A jury is free to choose among reasonable constructions of the evidence. *United States v. Clark*, 577 F.3d 273, 284 (5th Cir. 2009).

Therefore, the Motions for Judgment of Acquittal [Doc. Nos. 400, 402] filed by Simpson and Gardner are **DENIED**.

### III.    Motions for New Trial

In evaluating a motion for new trial under Fed. R. Crim. P. 33, a court needs only to determine whether a new trial is required "in the interest of justice." The burden rests with the Defendants to show that aspects of the trial were so manifestly unfair that a new trial is necessary. *United States v. Sota-Silva*, 129 F.3d 340, 343 (5th Cir. 1997). Motions for new trial are not favored and are viewed with great caution. *United States v. Blackthorne*, 378 F.3d 449, 452 (5th Cir. 2004).

The jury's constitutional role in deciding criminal trials leaves little room for judicial second-guessing. *United States v. Crittenden*, 46 F.4th 292, 296 (5th Cir. 2022) (en banc). Thus, courts generally employ Rule 33 in two situations: either when error infects the trial (such as the erroneous admission or exclusion of evidence, inflammatory comments by a lawyer, or faulty jury instructions), or when the court believes the evidence weighs heavily against the verdict. *Id*. The defendants argue both types here.

A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant. *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004). "To show that an error

17

affects a defendant's substantial rights, the defendant is ordinarily required to show that the error affected the outcome of the district court proceedings." *United States v. Brown*, 826 F.3d 835, 838 (5th Cir. 2016) (cleaned up).

Defendants[41] allege the following: (A) the evidence weighs heavily against the verdict; (B) prejudicial comments were made by the court in the presence of the jury that affected the trial; (C) the exclusion of admissible evidence violated Defendants' right to present a defense; and (D) the prohibition of the proper use of FD-302 reports to refresh recollection was error that prejudiced the defense.

Each will be addressed in turn.

### A.  Weight of the Evidence

In contrast to a motion for acquittal, when considering a motion for new trial, the trial judge may weigh the evidence and may assess the credibility of witnesses. *United States v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997). As set out in detail in the ruling herein on the Defendants' motions for judgment of acquittal, the evidence against both Simpson and Gardner does not weigh heavily against the verdict.

Simpson was convicted of a conspiracy to commit bank fraud and four counts of bank fraud. The evidence was sufficient as to the same. Simpson was the decision maker. Undoubtedly, he made the decisions on how much to deposit and where each deposit was to be made. The emails between Simpson and Gardner show Simpson's intent to deceive. He admittedly sought to use the float and to deceive the banks. The testimony showed Simpson increased his own salary and gave himself large bonuses, despite the companies actively losing money.

---

[41] Simpson adopted Gardner's arguments for new trial. [Doc. No. 402, p. 2].

Additionally, the evidence was sufficient for the four counts of bank fraud. Simpson knew when he obtained the four (4) cashier's checks from Origin Bank that the accounts had been inflated with approximately $4,000,000 in checks from People's Bank, which only had $2,000.00 in People's Banks accounts.  The actions by Simpson caused a loss to Origin Bank of over $3,000,000.00. The jury determined intent. There was more than sufficient evidence for the jury to have found Simpson guilty on all five counts.

Moreover, Gardner was convicted only of conspiracy to commit bank fraud. Gardner's primary argument is that Simpson was his boss, and the primary actions were completed by Simpson. The trial was full of testimony and evidence of actions taken by Gardner in which he fully participated in the conspiracy. Gardner was involved in making the deposits, supervising the deposits, and was a party to most of the emails detailing deposits to be made. Gardner's emails with Simpson detail how both knew the extent of the check-kiting scheme and the need to move deposits back and forth to use the bank float. The evidence also showed increases in Gardner's salary and bonuses, even when the accounts were showing negative balances. Further, the evidence showed Gardner was a certified public accountant.[42] Although Gardner's involvement was certainly less than Simpson's involvement, the evidence was more than sufficient to show Gardner's involvement in the conspiracy to commit bank fraud.

### B.  Comments Made by the Court

Fed. R. Evid. 801(d)(Z)(E) allows the admission of coconspirator statements as non-hearsay if the court determines by a preponderance of the evidence that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements

---

[42] [Doc. No. 371, p. 33].

were made in the course of and in furtherance of the conspiracy. *Bourjaily v. United States*, 107 S.Ct. 2775, 2778 (1987). This determination is made by the judge alone based upon independent evidence. *United States v. James*, 590 F.2d 575, 582-83 (5th Cir. 1979).

Although the preference prior to admission of co-conspirator statements is to hold a "*James*" hearing (per *United States v. James*, 590 F.2d 575 (5th Cir. 1979), a *James* hearing is not required, and the trial court retains some discretion. *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994).

During the testimony of Agent Stephens[43] the Government sought to admit text messages between Simpson and Gardner, subject to the later recall of the witness and proof of a conspiracy.[44] The Court ruled at a bench conference that these text messages were not yet admissible as coconspirator's statements.[45]

Later that same day, the Government again sought to admit the text messages between Simpson and Gardner as coconspirator statements.[46] The defendants sought a limiting instruction.[47] The Court then stated:

> Okay. All right. I just didn't know.
> So at this point -- but I'm going to do a similar instruction if they prove the conspiracy part that this now can be considered against both of them if that is proved. I'm going to tell them the same thing if that's done.
>
> So all I'm saying right now is this -- if it's a statement of Mr. Simpson, he can only use it as him, for the time being. And if it's a statement of Mr. Gardner, it can only be used against him for the time being, okay. As to these. I'll instruct you later if that changes.[48]

---

[43] [Doc. No. 371, pp, 6-126].
[44] [Id., at pp. 88, 89, and 91].
[45] [Id., at pp. 65, 74-76].
[46] [Id., at p. 146].
[47] [Id., at p., 147].
[48] [Id].

At a sidebar, the Government asked to admit the text message pursuant to the coconspirator exception to the hearsay rule. The Court denied admission of the messages as coconspirator statements because the predicate proof of a conspiracy had not yet been made.[49]

Simpson and Gardner's attorneys expressed concern that the previously discussed statements made in the presence of the jury could be prejudicial in the event the Court allowed coconspirator statements into evidence because the jury may believe the judge has found there was proof of a conspiracy.[50] After a discussion between defense attorneys outside the courtroom, a motion for mistrial was made, which was subsequently denied.[51] A limiting instruction was then requested by defense counsel.[52] Immediately after bringing the jury back into the courtroom, the Court gave the following limiting instruction:

> Let me just say one thing that I want to make sure you understand. I don't make any decision on whether there's a conspiracy or not. I mentioned, you know, that I have to make -- that's something totally unrelated. That has nothing to do -- the jury makes the determination, not me. Nothing I have said -- I don't make that determination at all. All I'm talking about are evidentiary things right now. The jury completely makes that.
>
> So if I said anything to lead you to believe I believe one way or the other whether that's been proven, ignore it. Because I'm -- you know, I'm not at all -- I don't have a dog in the -- well, a dog in the hunt, but not to determine guilt or innocence. My job is to be -- have a fair trial. And so I want to make sure y'all understand that, that anything I may have said about that, I was not talking about what y'all will have to decide on whether it's conspiracy or whether it's bank fraud. I have no opinion on that.
>
> And so I want to make sure y'all understand that and don't think I have said one thing or another about that because it's

---

[49] [Id. at pp. 148-149].
[50] [Id. at pp. 149-153].
[51] [Id. at p. 155].
[52] [Id. at pp. 155-156].

not the same thing.
So, y'all understand?[53]

Simpson and Gardner argue that since the text messages between Simpson and Gardner were later admitted into evidence when Agent Stephens was recalled,[54] that broadcast there was in fact a conspiracy.

A similar incident occurred in *United States v. Lance*, 853 F.2d 1177 (5th Cir. 1988). In *Lance*, the trial judge made a finding in the presence of the jury that prosecution had proven that a conspiracy existed between the defendants (for purposes of the admissibility of coconspirator statements). The defendants argued on appeal that the judge's statement amounted to "a directed verdict of guilty." *Id*. at 1182.

In finding that the judge's statement did not result in an unfair trial, the court stated:

> As an appellate court, however, we cannot evaluate a claim of judicial misconduct during the trial by viewing a single statement in isolation. We have consistently held that in determining whether a trial judge overstepped the bounds of acceptable conduct – that is, violated his duty to conduct the trial impartially – we must "view the proceedings as a whole."

> *Lance*, 853 F.2d at 1182.

The court found the statements did not result in an unfair trial because the trial court made the statement in the course of an evidentiary ruling and added some curative language to the jury instruction on conspiracy. *Id*. at 1183.

The language and facts in *Lance* were much stronger for a new trial than the present case. The ruling by the court in the present case was an evidentiary ruling in which found the Government had not prescribed sufficient evidence of a coconspirator statement to be admitted.

---

[53] [Id. at pp. 157-158].
[54] Agent Stephens was recalled seven days later, on April 17, 2024 [Doc. No. 376, p. 181].

Additionally, the Court in this case immediately gave a curative instruction to the jury which explained that it was the jury's decision as to whether a conspiracy existed – not the Court's.

Other circuits have found the same in similar circumstances. *United States v. Sevilla-Acosta*, 746 F.3d 900 (8th Cir. 2014) (ruling on the admissibility of a coconspirator's statement was harmless error where the district court offered a curative instruction); *United States v. Hester*, 140 F.3d 753 (8th Cir. 1998) (harmless error when the court ruled on admissibility of coconspirators statement in the presence of the jury, followed by a curative instruction); and *United States. v. August*, 745 F.2d 400 (6th Cir. 1984) (trial court's reference, before the jury, to the court's prior finding that a conspiracy existed, was harmless error).

A court is required to conduct a hearing on a preliminary question so the jury cannot hear it when justice so requires it. Fed. R. Evid. 104(c). However, in viewing the record as a whole, in light of the wording of the objectional language, in light of the curative instruction to the jury, and in light of the fact that no conspirator exception evidence was admitted until seven days later, any error would be harmless error.

### C.  Exclusion of Evidence

Gardner argues that the exclusion of key admissible evidence violated Gardner's right to present a complete defense. Although Simpson adopted Gardner's arguments, this issue only affects Gardner. Gardner argues that he was prejudiced by being prohibited from questioning witness Kassidy Broussard as to her impressions and observations, by not being allowed to impeach Broussard in relation to statements contradicting her trial testimony, by a sworn statement in a civil case, and by Broussard's statements made to the Government in an FD-302.

### (i)    Perception or observation

In cross-examining Broussard, Gardner asked the following question:

23

> And these nonbudgeted personal expenses, did you understand Mr. Gardner to be frustrated by those?[55]

An objection by the Government based upon speculation was sustained.[56] Later, the following question was asked by Gardner:

> Based upon your personal perceptions of what you observed while you worked in the accounting department, did you believe Mr. Gardner to be frustrated by these nonbudgeted personal expenses?[57]

An objection by the Government was again sustained as not within the witnesses' perception based upon Fed. R. Evid. 701.[58] Fed. R. Evid. 701 is limited to those opinions and inferences that are rationally based on the perception of the witness. Broussard did not testify to anything she observed which would have allowed her to answer that question, other than Gardner telling her that. Therefore, the answer would not have been allowed under Fed. R. Evid. 701 or as a hearsay exception. Also, a defendant cannot elicit his own self-serving statements through the testimony of another witness. *United States v. Sanders*, 639 F.2d 268, 270 (5th Cir. 1981).

Even if there was any error, it would be harmless error because the information Gardner sought to admit (that Gardner disliked dealing with Danny Jones' personal expenses) was brought out to the jury.[59]

Another question objected to at trial was the following questions by Gardner addressed to Broussard with regard to receiving text messages about the deposit transfers:

> Did you know if Gardner liked having to do that?[60]

---

[55] [Doc. No. 373, p. 46].
[56] [Id., p. 47].
[57] [Id.].
[58] [Id., p. 48].
[59] [Id., p. 48].
[60] [Id., p. 88].

This objection was sustained for the same reasons – lack of foundation under Fed. R. Evid. 701, and as an attempt to elicit Gardner's self-serving testimony. The answers that Gardner wanted to elicit were admitted by Broussard to be based upon what Gardner told her.[61] The sustaining of objections, even if error, were harmless error based upon the totality of the record.

### (ii)    The FD 302 and Affidavit

Gardner sought to cross-examine Broussard as to alleged contradictory statements made by Broussard to Agent Stephens in an interview, and in an Affidavit. The interview was summarized by Agent Stephens in an FBI FD-302 form. The form was proffered.[62] Additionally, Gardner sought to cross examine Broussard as to alleged contradictory statement made in an Affidavit[63] filed into the record in a civil proceeding.[64] Broussard had testified during direct examination that Gardner gave her the transfers for the People's Bank account on March 8, 2017.[65]

First, Gardner asked Agent Stephens on cross-examination:

> And, sir, does that refresh your recollection as to whether you learned during the course of your investigation that Mr. Jones was always on the phone with Mr. Simpson?[66]

The Court sustained the Government objection based upon hearsay because Agent Stephens would have learned this based upon an interview with a non-testifying witness.[67] No matter how the question was phrased, Agent Stephens would have had to state what a non-testifying witness told him, to answer Gardner's question. It was classic hearsay. Gardner sought

---

[61] [Id., p. 101].
[62] [Doc. No. 352-66, Exhibit #754)].
[63] [Doc. No. 352-63, Exhibit #719)].
[64] *United Home Care, Inc., et al, v Charlie Simpson*, et al No. C 2017-1296 Ouachita Parish, Fourth Judicial District Court.
[65] [Doc. No. 372, pp. 190-191].
[66] [Doc. No. 371, p. 120].
[67] [Id., at pp. 122-123].

to elicit the "truth of the matter stated" by Agent Stephens stating what a non-testifying witness told him.

In the second alleged error, Gardner argues that he should have been allowed to impeach Broussard using the FD 302.[68] At trial, Broussard testified that Gardner gave her check books for the People's Bank accounts and instructions on checks to be written from those accounts.[69]

Broussard was asked:

> Do you recall that you told the government when you met with them that someone else instructed you to write the People's checks not Mr. Gardner?

Broussard answered, "I do not recall that."[70]

Whether to impeach or to refresh recollection, it was improper. A witness may not be impeached by an agent's report unless it is adopted by the witness or is a "substantially verbatim" account. *United States v. Welch*, 810 F.2d 485, 489 (5th Cir. 1987). The FD-302 at issue shows the document was drafted on March 11, 2021, by Agent Stephens per an interview of Brossard on March 8, 2021. It was not signed by Broussard. Therefore, the attempted impeachment of Broussard by using the F-302 was improper because it was not a statement adopted by Broussard.

In the third alleged error, Gardner sought to cross-examine Broussard on an Affidavit[71] that was filed in a civil proceeding between United Home Care and Simpson. This Affidavit was signed by Broussard before a Notary Public on October 6, 2021.

After numerous preliminary objections/and concerns by the Government and Simpson, the Court ordered the questioning of Broussard outside the presence of the jury in order to see what

---

[68] Proffered at [Doc. No. 352-66, Exhibit 754].
[69] [Doc. No. 372, pp. 190-191].
[70] [Doc. No. 373, pp. 102-103].
[71] [Doc. No. 352-63, (Exhibit 719)].

exact questions were going to be asked by Gardner to Broussard.[72] Despite that, not a single question was asked by Gardner to Broussard about the Affidavit during Broussard's questioning outside the presence of the jury.

The first mention of Broussard's Affidavit came after the testimony of Broussard outside the presence of the jury.[73] Instead, all of Gardner's questions were about impeachment related to the FD-302 and about Broussard's perception of Gardner's actions. The purpose of the hearing outside the jury's presence was for this Court to determine which question would be allowed and which would not. Since Gardner failed to question Broussard about the Affidavit, there was nothing before the Court to determine whether questions about the Affidavit were proper. Therefore, the Court believes the objection in regard to the Affidavit has been waived by Gardner.

This Court ruled based upon the questions asked at the hearing.[74] Had Gardner asked Broussard questions about contradictory statements in the Affidavit, the Court would likely have allowed it. Simply put, the Court gave Gardner an opportunity to ask questions of Broussard outside the presence of the jury that Gardner wanted to ask Broussard at trial. Gardner did not ask a single question about that Affidavit to allow the Court to rule on that question. Therefore, Gardner has waived that issue.

In examining the Affidavit of Broussard, even if this objection had been preserved, Gardner would not be entitled to a new trial. The only portion at issue is Paragraph 6, which reads as follows:

---

[72] [Doc. No. 373, pp. 98-107].
[73] [Doc. No. 373, pp. 111-114].
[74] The ruling was based both upon *Bruton v. United States*, 391 U.S. 123 (1968), and upon a hearsay objection. [Doc. No. 373, p. 117]. Despite strenuously arguing a Bruton violation at trial, the Government has evidently conceded that argument was invalid.

> During my employment at United and Trinity, every bank transfer was initiated by Charlie Simpson. No bank transfers were ever initiated by Mr. Gardner. At or around the time he made a bank transfer, Mr. Simpson would inform Mr. Gardner and me of the details of the bank transfer via group text message. In fact, if Charles Gardner was out of the office, Simpson would send transfer orders which would be completed without any involvement or knowledge of Gardner. Should Charlie Simpson not be in the office, he would still send bank transfer directions via text message.[75]

The testimony Gardner wanted to cross-examine Broussard on was in regard to the checks written on the People's Bank accounts on March 8, 2017. Broussard testified to the content in a message sent to Broussard by Gardner. Gardner asked Broussard to come see him. Broussard testified that she then met with Gardner. She was given transfers for the People's Bank account. She also testified that she had been given the People's Bank checkbooks by Gardner earlier that day. Broussard then documented checks written by her on the People's Bank account.[76]

Evidently, the purpose of the cross-examination of Broussard by Gardner was to show that the issuance of the People's Bank checks was initiated by Simpson, not Gardner. Broussard did not testify as to Simpson's involvement on the issuance of the People's Bank checks, but previously testified she received transfer instructions from both Simpson and Gardner, but that Simpson was the one who would determine the accounts to be used for transfer, and the amounts that needed to be transferred. She also testified that Gardner would supervise the transfers.

The jury was well aware that Simpson decided what amounts and accounts to transfer, and that Gardner only supervised those transfers. Therefore, there was no error which affected the substantial rights of Gardner that warrants a new trial. The jury found Simpson guilty, but did not

---

[75] [Doc. No. 352-63, p. 3, Para. # 6 (Exhibit K, Affidavit of Kassidy Broussard Lachner)].
[76] [Doc. No. 372, pp. 190-194].

find Gardner guilty on the bank fraud charges. The jury verdict itself reflects the jury's awareness that Simpson was controlling the decisions. The totality of the evidence shows there was no error which affected the outcome of the trial.

Therefore, Simpson and Gardner's Motion for New Trial [Doc Nos. 399, 402] is hereby **DENIED**.

### IV.    CONCLUSION

For the reasons set forth herein, Simpson and Gardner's Motions for Judgment of Acquittal and Motion for New Trial [Doc. Nos. 399, 400, and 402] are **DENIED**.

Sentencings for said Defendants shall be refixed for July 16, 2025, at 1:30 p.m.

**MONROE, LOUISIANA**, this 17th day of March 2025.

_____
**TERRY A. DOUGHTY, JUDGE**
**UNITED STATES DISTRICT COURT**